IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| GEORGE RODRIQUE II,<br><br>                    Plaintiff<br><br>          v<br><br>HEARST COMMUNICATIONS, INC. HEARST<br>STATIONS, INC., MASSACHUSETTS<br>DIRECTOR OF UNEMPLOYMENT<br>ASSISTANCE,<br><br>                    Defendants | No._____ |

## COMPLAINT

Plaintiff, George Rodrique, II (Plaintiff or Mr. Rodrique), by and through undersigned

counsel, brings this Complaint against Hearst Communications, Inc. and Hearst Stations, Inc.

(collectively Hearst), as well as against the Massachusetts Department of Unemployment

Assistance (DUA), and alleges as follows:

## INTRODUCTION

1.      In the decades prior to the COVID-19 pandemic, terminating an employee based on

exaggerated fear that he may transmit an infectious disease to others may have led to

serious negative consequences for an employer in the courts of law and public opinion.

Laws prohibiting workplace discrimination, as well as Oscar-winning courtroom dramas

like Philadelphia, the film about a homosexual lawyer fired by his firm after contracting

AIDS, reinforced the general climate of workplace tolerance for people with disabilities

and members of other protected groups. Reviewing Philadelphia in 1993, Hearst

Communications, Inc. (Hearst) property Esquire Magazine called on Hollywood to devote even more of "its talent to making movies that combat the ignorance and prejudice associated with AIDS."

2.    During the COVID-19 pandemic, Hearst's message to its own employees quickly became far less tolerant. Hearst executives vowed to terminate every employee who was not vaccinated against COVID-19, and was therefore perceived as more likely to contract and spread the disease. Justifying such drastic action in an email to staff, Hearst admitted to be motivated by the same prejudice that, decades earlier, it condemned in association with AIDS: "the bulk of our vaccinated employees are concerned about potential exposure to unvaccinated individuals."

3.    Plaintiff, George Rodrique II (Mr. Rodrique), an Emmy award-winning videographer for Hearst television and radio division, Hearst Stations, Inc., chose not to get vaccinated against COVID-19 for religious reasons. As a result of this choice, Hearst coercively interfered with Mr. Rodrique's legal rights, refused to accommodate Mr. Rodrique's sincerely-held religious beliefs, and terminated Mr. Rodrique on November 16, 2021 after nearly two decades of dedicated service.

4.    A month before Mr. Rodrique was terminated for being unvaccinated, the Massachusetts Department of Unemployment Assistance (DUA) adopted an official policy of turning a blind eye to workplace discrimination laws in its adjudication of vaccine termination cases—forbidding claims adjudicators from making any "determinations regarding an employer's compliance with the reasonable accommodation provisions of the ADA, Title VII of the Civil Rights Act of 1964, MGL c. 151B, or any other EEO considerations or

legal requirements." Consequently, DUA claim adjudicators denied Mr. Rodrique's unemployment insurance benefits without any prior or subsequent hearing.

5. Hearst and DUA's actions subjected Mr. Rodrique to emotional distress, pain, suffering, and loss of consortium, as well as to economic loss, including, but not limited to, lost wages, the loss of future earning capacity, future loss of income, and job search expenses. Therefore, pursuant to the aforementioned workplace discrimination laws and other rights of action, Mr. Rodrique brings his claims before this Court.

## PARTIES

6. Plaintiff George Rodrique (Mr. Rodrique) is a resident of Connecticut, residing at 105 Larkspur Road, Stamford, Connecticut. Mr. Rodrique was employed in Massachusetts as a videographer at Defendant Hearst Stations, Inc. (Hearst Stations) for approximately sixteen years.

7. Defendant Hearst Communications, Inc. (Hearst Communications) is a media conglomerate based in New York that owns broadcasting, newspaper, magazine, and online media properties, which altogether employ an estimated 20,000 individuals.

8. Defendant Hearst Stations, Inc., also doing business as Hearst Television, Inc., is a fully-owned subsidiary of Hearst. Hearst Stations, Inc. owns and operates the Boston television broadcasting channel WCVB-TV (WCVB) in Boston, Massachusetts, as well as thirty-two other television and two radio stations serving twenty-six media markets across thirty-nine states, with an estimated 3,000 employees. Hearst Stations's registered agent in Massachusetts, C T Corporation System, is located at 155 Federal Street, Suite 700 in Boston. WCVB's offices are located at 5 TV Place in Needham, Massachusetts.

9.    Defendant Director of the Department of Unemployment Assistance (DUA) is charged
      under G.L. c. 23, §§ 1, 9J with the administration of the unemployment insurance
      program in Massachusetts pursuant to the Massachusetts Unemployment Insurance Law,
      G.L. c. 151A, § 1 et seq. DUA's principal place of business is located at 19 Staniford St,
      Boston, MA 02114.

## JURISDICTION AND VENUE

10.   This Court has original jurisdiction over Mr. Rodrique's claims pursuant to 28 U.S.C. §§
      1331 and 1343, as well as pursuant to 42 U.S.C. § 2000e-5(f)(3). Mr. Rodrique's claims
      arise under 42 U.S.C. §§ 503(a)(3), 1981, 1983, 2000e-5(f), 12111-17, and 12203.

11.   This Court has supplemental jurisdiction over Mr. Rodrique's state law claims pursuant
      to 28 U.S.C. § 1367.

12.   Claims under G.L. c. 151B, § 9 are properly brought in this Court after the exhaustion of
      administrative remedies, as Mr. Rodrique has timely filed a complaint with the
      Massachusetts Commission Against Discrimination (MCAD) pursuant to G.L. c. 151B, §
      5, and received a "permission to sue" letter from MCAD on June 29, 2022. See Exhibit
      A.

13.   Claims under 42 U.S.C. §§ 2000e-5(f), 12111-17, and 12203 are properly brought in this
      Court after the exhaustion of administrative remedies, as Mr. Rodrique has timely filed a
      complaint with the Equal Employment Opportunity Commission (EEOC) pursuant to 42
      U.S.C.S. § 2000e-5(b), and received a "permission to sue" letter from EEOC on
      September 20, 2022, within 90 days of the filing of this lawsuit. See Exhibit B.

14.     Venue in the District of Massachusetts is appropriate pursuant to 42 U.S.C.S. § 2000e-
        5(f)(3) because the herein alleged unlawful employment practices by Hearst against Mr.
        Rodrique occurred in Massachusetts.

## STATEMENT OF FACTS

15.     Mr. Rodrique started working at Hearst Communications, Inc. and Hearst Stations, Inc.
        (collectively Hearst) in 2004 as a freelance videographer for WCVB, and was hired on as
        a full-time videographer for WCVB's news division in 2006, where he worked until
        2015, when he briefly moved out of state for family reasons and worked for a competitor
        television station. In 2016, he returned to Boston, where he was hired back by Hearst as a
        full-time videographer for WCVB's award-winning nightly newsmagazine program,
        Channel 5 Chronicle.

16.     During the entirety of his full-time employment at Hearst, Mr. Rodrique was a member of
        Local Union No. 1228 of the International Brotherhood of Electrical Workers, AFL-CIO
        (IBEW Local 1228); and his employment relationship with Hearst Stations was governed
        by a series of collective bargaining agreements between IBEW Local 1228 and WCVB,
        as a division of Hearst.

17.     The collective bargaining agreement between WCVB and IBEW Local 1228 for the years
        2017-2021 prohibits "unjustifiable" discharges of IBEW Local 1228 member employees
        like Mr. Rodrique. WCVB's refusal to reinstate a member employee whom it discharged
        without just cause may become a subject of arbitration under the collective bargaining
        agreement.

18.     Separately, pursuant to the 2017-2021 collective bargaining agreement:

        If an Employee (i) is laid off or (ii) voluntarily quits his or her employment due to
        such special circumstances beyond his or her control as serious health

> requirements of himself or herself or his or her dependents or (iii) has his or her
> employment terminated by the Employer other than by discharge, the Employer
> will . . . pay such Employee one (1) week's severance pay for each complete year
> of employment with the Employer, up to a maximum of twenty-eight (28) weeks'
> pay. . .

19. Throughout his employment at WCVB, Mr. Rodrique served with distinction and dedication, learning many skills and performing diverse video production roles, including non-linear video editing, helicopter aerial videography, licensed drone videography, and overnight breaking news.

20. Mr. Rodrique was proud to be a WCVB employee, and his face brightened when he talked about his work. His job was his identity. He owned many sets of clothing and other gear with the company logo, and his friends knew him as the Chronicle Guy.

21. It was Mr. Rodrique's routine to be at work well before the start of his assignment, and he was willing to do anything, including to put his own life in jeopardy, in order to do his job for Hearst.

22. As law enforcement officers chased the 2013 Boston Marathon bombers into Watertown during the early hours of April 19, 2013, Mr. Rodrique chased after the officers in his WCVB news sports utility vehicle, following police vehicles so closely that he was able to run the same red lights. Putting themselves directly in the middle of the danger and chaos, Mr. Rodrique and his news crew were one street away from the ensuing shootout between law enforcement and the bombers, in which all sides fired 200 bullets in all directions; the bombers exploded two pipe bombs and a large pressure cooker bomb; and an officer was critically wounded by friendly fire. After the younger bomber had fled into the surrounding neighborhoods, a SWAT officer encountered Mr. Rodrique's news crew in the streets and aimed his rifle in their direction before realizing that they were not a threat.

23.    In 2017, a year after he joined WCBV's Channel 5 Chronicle newsmagazine, Mr. Rodrique won a local Emmy Award in the Outstanding Politics and Government Documentary category.

24.    The work that Mr. Rodrique performed for Hearst was far from an indoor office desk job. Being a news and documentary videographer, his workplace was in the field. He always received his daily assignments without going into the WCVB's offices in Needham; and from the start of the COVID-19 pandemic until he was terminated—a period of nearly two years—Mr. Rodrique had visited WCVB's offices in Needham on only three occasions, briefly, and only to drop off some video footage.

25.    During the summer months, about 75% of Mr. Rodrique's time on the job was spent outdoors. During the winter months, that amount dropped to about 50-60%.

26.    Each WCVB news crew member drove his or her own vehicle to the assignment. Sometimes Mr. Rodrique worked alone, but usually his crew included him and a producer. An anchor would join the crew if the assignment involved on-video news reporting. About 20% of the time, the anchor would also interview a human subject of the news report.

27.    The practical reality of news videography and camera focal length always requires a certain minimum distance between the lens of a camera and its subject. This tended to ensure that Mr. Rodrique was more than six feet away from his subjects, anchors, and other members of the crew as he did his job.

28.    When, prior to joining the Chronicle team, Mr. Rodrique worked on overnight breaking news or on helicopter videography assignments for Hearst, he had practically no human

interaction in his job. He was assigned his own sports utility vehicle, and drove it directly to the breaking news scene from home.

29. Mr. Rodrique's drone operator license, which he earned during the early months of the pandemic in July 2020, and which is a qualification that very few other Hearst videographers possess, allows him to go on assignments with absolutely no human interaction. Mr. Rodrique is able to operate the drone, shoot the video footage, and transfer the video footage to Hearst over a high speed internet connection in complete solitude.

30. Mr. Rodrique was baptized and confirmed by the Catholic Church, but grew alienated from it after the child abuse scandals of the early 2000s. Since then, he has strived to develop his own spiritual guidelines; which he has constructed through an amalgamation of biblical maxims, many other ideologies and spiritual practices, and personal experiences that help to guide him down the proper path in life.

31. It is Mr. Rodrique's sincerely held religious belief that human beings have been endowed by the Creator to have free will and the liberty to choose what they feel is best for their own bodies, in accordance with His (and only His) commandments. Mr. Rodrique believes that no earthly entity, whether an individual, a corporation, or a government, may violate another individual's free will and sacred bodily integrity through coerced medical treatment.

32. Many years ago, after experiencing health problems, Mr. Rodrique quit drinking alcohol and eating a poor diet. Since then, he has stopped taking several prescribed medications, and now seeks to practice a form of spiritual asceticism that requires him to avoid polluting his body with foreign substances—particularly substances that do not exist in

nature, having been entirely invented, owned, and marketed by humankind. These beliefs are also based on a Catholic foundation, which is woven throughout Mr. Rodrique's spiritual creed. Cf., 1 Corinthians 6:19 ("Do you not know that your body is a temple of the holy Spirit within you, whom you have from God, and that you are not your own?").

33.     Mr. Rodrique believes that God has given humans natural immunity, and that commercial vaccines created, owned, and marketed by profit-making corporations intrude on God's sacred place within the temple of the human body. Cf. John 2:16 ("[Jesus said to the merchants:] 'Take all this out of here and stop using my Father's house as a market.'"). Mr. Rodrique therefore believes that injecting unnatural substances into his body spiritually pollutes and desecrates it, preventing him from achieving a higher place of spiritual evolution.

34.     Throughout his years at Hearst, Mr. Rodrique was often outspoken and willing to push back on unreasonable demands, while always maintaining an overall positive relationship with his colleagues. Because he was always working hard to create beautiful and creative visuals, as long as he was making great TV, his supervisors at Hearst had no desire to challenge him over his personal religious and political beliefs.

35.     About one month into the COVID-19 pandemic, Hearst's attitude toward its employees' religious and political beliefs suddenly became far less tolerant.

36.     On March 18, 2020, Mr. Rodrique had posted his own opinion to his own personal Facebook account, stating in relevant part: "This virus originated in China & became a pandemic because the Communist Party lied about it. . . . [Perhaps] I wouldn't call it the Chinese virus..but Wuhan virus is perfectly appropriate."

37.   Indeed, just a month prior, WCVB's own news coverage still routinely referred to SARS-CoV-2 as the "Wuhan coronavirus." See, e.g., Emily Riemer, Risk of Wuhan coronavirus infection low in United States, WCVB.com (Feb. 18, 2020), https://www.wcvb.com/article/umass-boston-student-with-wuhan-coronavirus-visited-campus-health-center-school-officials-say/30755978.[1]

38.   However, when Mr. Rodrique referred to SARS-CoV-2 as the "Wuhan virus" on Facebook just one month after WCVB had itself used the term in its headlines, WCVB President and General Manager Bill Fine (Fine) immediately began a personal investigation into what he claimed was Mr. Rodrique's "unacceptable social media activity."

39.   Fine's investigation consisted of reviewing all of Mr. Rodrique's activity on various social media platforms stretching back over the previous two years. The investigation did not find any additional unacceptable Facebook posts, but did uncover three additional social media posts on Mr. Rodrique's personal Twitter account, "Geotweets," with which Fine took issue:

   a.   "And THIS is exactly why the media is despised," from December 14, 2018.

   b.   "The mainstream media are pussies," from January 30, 2020.

---

[1] See also David Bienick, Flights between Boston, China to be restricted by federal order in wake of Wuhan coronavirus, WCVB.com (Feb. 1, 2020), https://www.wcvb.com/article/flights-between-boston-china-to-be-restricted-by-federal-order-in-wake-of-wuhan-coronavirus/30739136; Boston taking precautions in response to Wuhan coronavirus outbreak, WCVB.com (Jan. 27, 2020) ("The death toll from the Wuhan coronavirus has reached at least 80 in China and thousands of more cases have been confirmed."), https://www.wcvb.com/article/boston-sets-up-internal-incident-command-center-in-response-to-wuhan-coronavirus-outbreak/30680431; Elizabeth Cohen and John Bonifield, CDC confirms second case of Wuhan coronavirus in US, WCVB.com (Jan. 24, 2020), https://www.wcvb.com/article/cdc-confirms-second-case-of-wuhan-coronavirus-in-us/30654243.

     c.  A tweet from February 19, 2020 criticizing reporting by the digital media company, the Daily Dot, which is not a Hearst property.

40.    On the basis of his investigation into Mr. Rodrique's social media activity, Fine found that Mr. Rodrique violated Hearst policy by posting "racially offensive remarks about coronavirus on Facebook," and "vulgar and reckless remarks about the media on Twitter."

41.    Fine called Mr. Rodrique and berated him over the telephone, demanding that Mr. Rodrique beg for a second chance and formally apologize for his actions. As Fine disparaged Mr. Rodrique's political beliefs, Mr. Rodrique felt that, if he argued back, he would have been fired over the phone right then and there.

42.    On March 23, 2020, Fine threatened Mr. Rodrique in writing:

> Your contrition and awareness are acknowledged, but please understand that the damage is done. You violated Company policy, you repelled your colleagues, you broke our trust. In short, you committed terminable offenses. . . . The stakes are high. It is your responsibility to regain our trust and that of your colleagues. Improvement must occur immediately and must be maintained. Make no mistake, we will not tolerate any more unnecessary distractions from you. Any further lapses will result in termination without warning.

43.    Fine also suspended Mr. Rodrique without pay for ten days, required Mr. Rodrique to quit social media, including any accounts he had under pseudonyms, and required Mr. Rodrique to participate in Hearst's sensitivity training program, reporting "back to your managers on your progress and your learnings."

44.    On Friday, July 30, 2021, WCVB's new President and General Manager, Kyle Grimes (Grimes), who had replaced Fine on July 1, 2020, sent out an email to all staff under the subject: "Important COVID Updates - MUST READ".

45.    The email stated, in relevant part, that Hearst and the majority of its vaccinated employees regard and perceive their unvaccinated employees and colleagues as having a

physical impairment that substantially limits the operation of their immune system

functions, thereby substantially affecting their ability to work in Hearst offices:

> [I]t is becoming increasingly clear that the bulk of our vaccinated employees are
> concerned about potential exposure to unvaccinated individuals. . . . We remain
> committed to providing a safe and healthy work environment, but we can only
> accomplish that through your help. It is particularly this latter point that makes the
> recent news of the delta variant so distressing. **The science and data continue to
> demonstrate that vaccinations are our number one defense against COVID-
> 19.** [Emphasis in the original.] In the vast majority of instances, the vaccines
> protect individuals from infection. In cases where infections do occur, symptoms
> are less severe and perhaps most importantly, the need for hospitalization or even
> death [is] drastically reduced. That isn't allegory or hyperbole—that is fact.

46.    In the email, Grimes announced that, effective immediately after the weekend, Hearst

will require its employees to disclose their vaccination status to their human resources

representative; and that it will be implementing a discriminatory policy toward those

employees who are not vaccinated:

> Commencing Monday, August 2, 2021, every employee will need to demonstrate
> proof of vaccination to Kelsey Lawrence or me. . . If you are unwilling to
> demonstrate proof of vaccination (either because you have not been vaccinated or
> are unwilling to disclose your status), you will be treated/designated as
> unvaccinated for the purposes of our protocols. . . As a reminder, employees
> should not email or otherwise send a digital copy of their vaccination card to
> Kelsey. Instead, cards should be shown in-person. . .

47.    Under the discriminatory policy, in order to "provide additional comfort to [vaccinated]

employees," unvaccinated employees would have to get themselves tested weekly for the

presence of the SARS-CoV-2 virus. In addition, all unvaccinated employees would have

to quarantine for fourteen days "upon exposure to a COVID-19 individual"; while

vaccinated employees showing no symptoms would not be required to quarantine at all;

and vaccinated employees who were actually sick with COVID-19 symptoms would only

be required to quarantine for ten days.

48.  On August 13, 2021, Mr. Rodrique received a direct email from Hearst human resources coordinator Kelsey Lawrence (Lawrence), informing Mr. Rodrique that Hearst was classifying him as unvaccinated, and arguing that, for Mr. Rodrique, vaccination against COVID-19 is the most effective method of treatment in promoting a cure for the disease:

> we want to reiterate that consistent with guidance from the CDC and the Massachusetts Department of Health, WCVB and Hearst firmly believe that vaccination is the very best thing that you can do to protect yourself, your loved ones, your colleagues, and your community.

49.  Lawrence told Mr. Rodrique that Hearst is also "strongly encouraging" Mr. Rodrique to seek a second medical opinion from his own doctor or another medical provider. Lawrence also informed Mr. Rodrique that his unvaccinated status will require him to submit to an arbitrary and onerous weekly testing protocol.

50.  Mr. Rodrique agreed to comply with the testing protocols, as well as with Hearst's masking and other health monitoring requirements—doing so with diligence.

51.  On September 13, 2021, all employees of Hearst Communications (the Hearst corporate parent) received an email signed by the President and Chief Executive Officer of Hearst Communications, Steven Swartz (Swartz), and its Executive Vice President and Chief Operating Officer, Mark Aldam (Aldam). Swartz and Aldam informed Hearst Communications employees that about forty of their colleagues, or 0.2% of the Hearst Communications workforce, had active cases of the virus. According to Swartz and Aldam, on this basis, Hearst Communications will be "instituting a vaccine requirement for all employees."

52.  In their email, Swartz and Aldam argued that vaccination against COVID-19 is the "fairest, most understandable and most effective" method of treatment for Hearst Communications employees for promoting a cure from COVID-19. They also argued that

this medical opinion is "in keeping with the overwhelming opinion of the medical science community that vaccines are safe and essential to protect all of us from present and future variants of this dangerous and lethal virus."

53.   The following day, on September 14, 2021, Mr. Rodrique and other unvaccinated Hearst employees received an email from Katherine Barnett (Barnett), the Senior Vice President of Human Resources for Hearst, informing them that "full vaccination" against COVID-19 would soon be a required condition of continued employment, "regardless of whether full-time or part-time, [and] regardless of primary work location." According to the email, Hearst would consider requests for medical and/or religious accommodations to the mandatory vaccination policy "on an individual basis in accordance with applicable legal requirements." These requests would have to be made in writing by October 15, 2021. If an unvaccinated employee's request was denied, the employee would be terminated on November 19, 2021 for "non-compliance with Company policy."

54.   Upon receiving notice of the mandatory vaccine requirement, Mr. Rodrique immediately requested a religious accommodation.

55.   To adjudicate Mr. Rodrique's request for a religious accommodation, Hearst requested intimate information about his health and creed. On September 25, 2021, Mr. Rodrique submitted his written answers to Hearst's detailed and highly intrusive religious accommodation questionnaire, which deeply probed his religious beliefs about vaccination and other topics. The questions ranged from whether Mr. Rodrique's beliefs were based on an organized religious faith; to when he became an adherent of this faith; and to whether he is now, or ever has been in the past, an adherent of another faith.

Despite the overly invasive nature of the questionnaire, Mr. Rodrique readily and earnestly answered all the questions.

56.   On or about October 26, 2021, Mr. Rodrique had a virtual Zoom meeting with a junior vice president of human resources at Hearst, Kristin Hansen (Hansen). The meeting was ostensibly held to engage in the interactive process of accommodating Mr. Rodrique's religious beliefs. However, Hansen refused to discuss any possible accommodations of those beliefs to the vaccine requirement, instead interrogating Mr. Rodrique with even more intrusive specificity about his beliefs, and cross-examining him about questionnaire answers.

57.   Many such accommodations were available under the circumstances and within the nature of Mr. Rodrique's already-existing job functions. Hearst could have increased his assignments without human subjects from the current 80% to 100%. It could have transferred him back to helicopter videography assignments, or had him work on drone videography assignments full time, thereby also taking advantage of Mr. Rodrique's rare drone operator occupational licensing qualifications. Hansen offered no such options to Mr. Rodrique on behalf of Hearst at the October 26, 2021 interactive meeting.

58.   On November 4, 2021, a representative from Hearst's corporate office in New York came to Needham to speak to all WCVB office staff. As always, Mr. Rodrique was away on assignment. However, he later learned that the representative had announced that Hearst's employees will soon be "100% vaccinated," with the clear implication that there would be no unvaccinated employees working at any Hearst station after November 19, 2021.

59.   On November 5, 2021, Hansen, on behalf of Hearst, denied Mr. Rodrique's request for a

religious accommodation to the Hearst vaccination requirement. In the denial letter,

Hansen admitted that Mr. Rodrique has, indeed, "identified a sincerely held religious

belief that conflicts with the [Hearst] vaccination policy," but argued that there are, per

se, no "reasonable accommodations that would permit [Mr. Rodrique] to perform the

duties of [his] role and/or not result in undue hardship to the Company" without violating

this belief. See Exhibit C.

60.   Despite Mr. Rodrique having only entered Hearst offices a total of three times during the

course of the entire COVID-19 pandemic, each time briefly, just to drop off some video

footage, Hansen argued:

> we have conducted an individualized assessment of your situation and have
> determined that allowing you to be in our offices unvaccinated on an indefinite
> basis creates significant risk of substantial harm to the health or safety of our
> workplace and employees. Furthermore, we do not feel that additional measures
> for you to enter our offices unvaccinated are sufficient to mitigate these risks.
> Considering these safety risks, we cannot provide you the religious exemption
> you requested.

61.   Hansen's denial also argued that Mr. Rodrique's unvaccinated status substantially limits

his ability to work at Hearst—not because it makes Mr. Rodrique unable to perform the

essential functions of his job, but because Hearst perceives his being unvaccinated as a

physical impairment that substantially limits the operation of Mr. Rodrique's immune

system functions, thereby substantially affecting his ability to work in Hearst offices. As

Hearst explained:

> permitting unvaccinated employees to enter our offices would require the
> Company to conduct costly weekly COVID-19 testing to maintain workplace
> safety. Further, unvaccinated employees are much more likely to have to
> quarantine if exposed to COVID-19 than vaccinated employees. These
> quarantines are highly disruptive to our operations and inhibit our ability to
> conduct business. For these additional reasons, granting you an accommodation

from our vaccine requirement would pose more than a significant cost, difficulty, and/or burden on the Company.

62. Hansen's denial did not allege any specific essential functions of Mr. Rodrique's job or any bona fide occupational qualifications for doing this job that would be jeopardized by Mr. Rodrique's unvaccinated status. Hansen's denial did not address the facts that Mr. Rodrique's job included little human contact; that the nature of any videographer's job already makes it necessary to socially distance from any human subjects being video recorded; that Mr. Rodrique worked primarily outdoors, where COVID-19 transmission risk is low; and that his job assignments did not require any trips to the office whatsoever. Instead, Hansen merely stated, in an entirely conclusory fashion, that Hearst could not provide Mr. Rodrique with any reasonable accommodations that would not impose an undue hardship on the conduct of Hearst Communications' multibillion dollar business.

63. Hansen's letter denying Mr. Rodrique's religious accommodation was written with Hearst indoor office desk job employees instead of Mr. Rodrique in mind, and contained hypothetical undue hardship claims about office transmission and office absences that were entirely inapplicable to Mr. Rodrique's essential job functions as a field videographer.

64. Hansen's claims that vaccination is a bona fide occupational qualification rested entirely on impermissible coworker preference for not working with unvaccinated colleagues, as explicitly admitted by Grimes in his July 30, 2021 email to WCVB employees; as well as on stereotypical negative assumptions about the unvaccinated as a perceived category of physically-handicapped individuals who are more likely to have to quarantine because of their immune system's perceived inability to prevent COVID-19 transmission.

65.    Hansen's denial did not address any alternatives to the religious vaccination requirement whatsoever. Hansen merely contended that Hearst could not, in any conceivable circumstance, reasonably accommodate Mr. Rodrique's sincerely-held religious belief that the vaccination violates his creed.

66.    Hansen warned Mr. Rodrique that, if he does not receive his first vaccination dose by November 18, 2021, his employment at Hearst will cease on November 19, 2021, "and HR will contact you to discuss."

67.    On November 22, 2021, Mr. Rodrique received an email from Lawrence, the WCVB human resources coordinator, offering him "separation pay and other benefits" if he signed a separation agreement releasing Hearst of all legal claims.

68.    Under the draft separation agreement, Hearst required Mr. Rodrique to "waive all claims or rights arising under the Massachusetts Payment of Wages Law, G.L. c.149; the Massachusetts Fair Employment Practices Act, G.L. c.151B"; or any other legal right of action. Mr. Rodrique was also required to "give up all rights to any money or other individual relief based on any agency or judicial decision" against Hearst in his favor, including to any "compensatory, emotional or mental distress damages, punitive or liquidated damages, attorney fees, costs, interest or penalties."

69.    The draft separation agreement contained a highly restrictive confidentiality provision:

> This Agreement is strictly confidential. You will not communicate this Agreement's terms to any third party, whether verbally or in writing, by any means, including by social media such as Twitter and Facebook and the like. Any disclosure by you will cause [Hearst] irreparable harm that money cannot undo. Accordingly, violation of this section will entitle [Hearst] to temporary and permanent injunctive relief. Except as required by law, you have not disclosed and will not disclose any term of this Agreement, including any payment under this Agreement, to anyone except your immediate family members and your legal/financial advisors. Each of them is bound by this Confidentiality of Agreement provision, and a disclosure by any of them is a disclosure by you.

70.     In the draft separation agreement, Hearst acknowledged that Mr. Rodrique is not being discharged for just cause, but "is resigning from [Hearst] as a result of [Hearst's] policy," which, as Hearst had itself admitted in its November 5, 2022 denial of religious accommodation to Mr. Rodrique, truly conflicted with Mr. Rodrique's sincerely-held religious beliefs.

71.     In the draft separation agreement, Hearst offered to "agree[] that it will not contest [Mr. Rodrique's] claim for unemployment insurance," in consideration for him signing the agreement.

72.     In violation of Hearst's collective bargaining agreement with IBEW Local 1228, which entitles Mr. Rodrique to thirteen weeks of separation pay based on his thirteen years of employment by Hearst, the separation agreement provided for only approximately six weeks of pay to Mr. Rodrique.

73.     Mr. Rodrique retained counsel and, on December 12, 2021, rejected the separation agreement.

74.     On December 16, 2021, after rejecting the separation agreement, Mr. Rodrique filed a claim for unemployment benefits with DUA pursuant to G.L. c. 151A, § 38.

75.     On December 17, 2021, DUA issued a notice of monetary determination to Mr. Rodrique, calculating his total maximum unemployment benefit amount as $ 27,510.00.

76.     For more than one month thereafter, and well beyond the statutory deadline of "in no case more than ten days," see G.L. c. 151A, § 38(b), Hearst failed to respond to DUA's request for information about why Mr. Rodrique left work. Nevertheless, DUA improperly allowed Hearst to remain a party to Mr. Rodrique's claim proceedings past the deadline.

77.    On January 31, 2022, after Hearst finally responded to DUA's request for information in connection with Mr. Rodrique's claim proceedings, DUA issued a notice of disqualification to Mr. Rodrique. As it had implicitly threatened in the separation agreement, Hearst had alleged to DUA that Mr. Rodrique was discharged for committing "a knowing violation of a reasonable and uniformly enforced policy regarding vaccination requirements." According to DUA, Mr. Rodrique therefore had been discharged for deliberate misconduct in knowing violation of a uniformly enforced company rule or policy, and was disqualified from receiving unemployment benefits by the provisions of G.L. c. 151A, § 25(e)(2).

78.    Mr. Rodrique was not discharged for deliberate misconduct. As Hearst had admitted in its own denial of Mr. Rodrique's request for religious accommodation, and had offered to admit in Mr. Rodrique's draft separation agreement, Mr. Rodrique "resign[ed]" his employment because Hearst's newly-introduced vaccination policy fundamentally conflicted with his sincerely-held religious beliefs. When Hearst informed Mr. Rodrique that accommodating these beliefs would be impossible; and since violating these beliefs would be unacceptable to Mr. Rodrique; his reasons for leaving became of such an urgent, compelling, and necessitous nature as to make his separation both involuntary and no fault of his own. Cf. G.L. c. 151A, § 25.

79.    A month before Mr. Rodrique was terminated for being unvaccinated, DUA adopted an official policy of turning a blind eye to workplace discrimination laws in its adjudication of vaccine termination cases—forbidding claims adjudicators from making any "determinations regarding an employer's compliance with the reasonable accommodation provisions of the ADA, Title VII of the Civil Rights Act of 1964, MGL c. 151B, or any

other EEO considerations or legal requirements." See Exhibit D. Adjudicators were instructed not to "second guess" the employer's decision to deny a reasonable accommodation.

80. For nearly a year since having denied his unemployment benefits, DUA has failed to grant Mr. Rodrique the opportunity for a fair hearing to review the denial, despite receiving and accepting his application for such a hearing pursuant G.L. c. 151A, § 40.

81. On November 19, 2021, the same day that Hearst terminated Mr. Rodrique, Reuters reported that the COVID-19 vaccine rollout has "revealed a complex picture on transmission, especially in the face of new variants." It was already becoming clear that the vaccine was unable to stop transmission, and only had a marginal temporary effect. According to a study cited by Reuters, "three months after vaccination, vaccinated and unvaccinated people transmitted the virus to the same level."

82. In 1983, two years after the AIDS pandemic officially began, some scientists still believed that AIDS was spread through household contact with "intravenous drug abusers, prostitutes, homosexuals and Haitians-Dominicans." See Sharon Rutenberg, Household contact may transmit AIDS, United Press International (May 5, 1983), https://www.upi.com/Archives/1983/05/05/Household-contact-may-transmit-AIDS/7738420955200/. By the time the film Philadelphia was made, this belief was widely considered to be wrong and prejudiced.

83. In late 2021 and early 2022, the moralistic belief that COVID-19 was a "pandemic of the unvaccinated" was conventional wisdom, just like the belief that homosexuals were responsible for AIDS. Articles like I'm Furious at the Unvaccinated, and Unvaxxed, Unmasked and Putting Our Kids at Risk appeared in the New York Times. The Los

Angeles Times published a column under the title: <u>Mocking anti-vaxxers' COVID deaths is ghoulish, yes—but may be necessary</u>. The Washington Post printed a column called <u>Macron is right: It's time to make life a living hell for anti-vaxxers</u>.

84.     Hearst property Esquire also got in on the act. On November 19, 2021, the same day that Hearst terminated Mr. Rodrique, the magazine published an online article titled <u>Ask Dave: So What's the Protocol for Unvaxxed Family Members This Thanksgiving? You can let 'em come to dinner or tell 'em to go to hell.</u> The author was a strong proponent of the latter.

85.     The moral panic turned out to have been overblown. As of August 2022, "CDC's COVID-19 prevention recommendations no longer differentiate based on a person's vaccination status." <u>See</u> Greta M. Massetti, PhD et al., <u>Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems — United States, August 2022</u>, 71 Morbidity and Mortality Weekly Report 1057 (2022) (available at https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm).

86.     Hearst's discriminatory and retaliatory actions in wrongfully terminating Mr. Rodrique and fraudulently disqualifying him from receiving unemployment insurance benefits have made life a living hell for Mr. Rodrique. Hearst's actions have subjected Mr. Rodrique to economic loss, including, but not limited to lost wages, thirteen weeks of contractually-promised separation pay, $ 27,510 in unemployment insurance benefits, the loss of future earning capacity, future loss of aggregate income, and job search expenses—as well as emotional distress, pain, suffering, and loss of consortium.

87.     Mr. Rodrique was about ten years away from retirement age when Hearst terminated him, and it has been hard for him to find a new job in the rapidly evolving media environment.

88.   On information and belief, Hearst harmed Mr. Rodrique's reputation within the news media profession as a result of its false claims that he was fired for committing willful misconduct. Mr. Rodrique is concerned that potential employers will also refuse to hire him once they learn that he has made this complaint.

89.   The lack of a second income has put a significant strain on Mr. Rodrique's family finances, which currently bear the weight of two mortgages. He and his wife will need to delay retirement by several years, even as professional employment in videography has become harder for to him to find due to his age.

90.   The financial strain pales in comparison with the terrible emotional effect that being discriminated against by Hearst has had on Mr. Rodrique, and on his entire family. Like Mr. Rodrique before he was terminated, Mr. Rodrique's wife is a successful professional who is passionate about her job. She is a first-generation immigrant from Japan, a country that retains a certain patriarchal cultural attitude to gender roles in family income generation. Mr. Rodrique's long term unemployment has therefore put a significant strain on their marriage relationship. They have never before argued as heatedly as they have argued since Mr. Rodrique's termination; and Mr. Rodrique's sense of self-worth has diminished due to his dependence on his wife's income.

91.   Mr. Rodrique's father had been particularly proud of his son for working at Hearst, and often spoke of his son's Emmy and other accomplishments in television at family gatherings. Mr. Rodrique's termination came at a particularly bad time for both him and his father, as his father was entering hospice for heart failure.

92.     Mr. Rodrique experiences daily waves of anger, frustration, misery, anxiety, and

depression. As his wife describes it, it is as if his inner light has gone out, with shadow

now obscuring his path in life.

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**
**("TITLE VII") 42 USC §§ 2000e, et seq: DISCRIMINATION AND RETALIATION ON**
**THE BASIS OF RELIGIOUS BELIEF AND PRACTICE**

93.     Each of the preceding paragraphs 1 through 93 are hereby incorporated by reference.

94.     Title VII, 42 U.S.C. § 2000e-2(a), provides:

It shall be an unlawful employment practice for an employer— (1) to fail or
refuse to hire or to discharge any individual, or otherwise to discriminate against
any individual with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's race, color, religion, sex, or national
origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in
any way which would deprive or tend to deprive any individual of employment
opportunities or otherwise adversely affect his status as an employee, because of
such individual's race, color, religion, sex, or national origin.

95.     Claims of religious discrimination under Title VII are analyzed under a two-part

framework. First, a plaintiff must make a prima facie case that a bona fide religious

practice conflicts with an employment requirement and was the reason for the adverse

employment action. Second, if the plaintiff establishes a prima facie case, the burden then

shifts to the employer to show that it offered a reasonable accommodation, or if it did not,

that doing so would have resulted in undue hardship.

96.     Hearst admitted that Mr. Rodrique "identified a sincerely held religious belief that

conflicts with the [Hearst] vaccination policy." Nevertheless, it refused to engage in the

interactive process of accommodating Mr. Rodrique's religious beliefs, despite various

reasonable accommodations being available for an employee in Mr. Rodrique's

videographer position.

97.    Hearst's claims that it would experience undue hardship in accommodating Mr.
       Rodrique's religious practice were based on stated concerns about higher office
       transmission by unvaccinated persons that were inapplicable to Mr. Rodrique's remote
       field work, and that had been unfounded in the first place.

98.    Title VII, 42 U.S.C. § 2000e-3(a), also prohibits retaliation against an employee for
       opposing an employer's unlawful action prohibited by Title VII, or for having "made a
       charge, testified, assisted, or participated in any manner in an investigation, proceeding,
       or hearing under" Title VII.

99.    By contesting Mr. Rodrique's eligibility for unemployment benefits because Mr.
       Rodrique refused to give up all rights to any money or other individual relief based on
       any agency or judicial decision regarding his separation, Hearst retaliated against Mr.
       Rodrique on account of his having elected to exercise his rights to such relief under Title
       VII.

100.   Hearst's unlawful discrimination is the direct and proximate cause of deprivation of Mr.
       Rodrique's equal employment opportunities and his economic and non-economic
       damages. Hearst's discharge of and retaliation against Mr. Rodrique in violation of Title
       VII subjected Mr. Rodrique to economic loss, including, but not limited to lost wages,
       thirteen weeks of contractually-promised separation pay, $ 27,510 in unemployment
       insurance benefits, the loss of future earning capacity, future loss of aggregate income,
       and job search expenses—as well as emotional distress, pain, suffering, and loss of
       consortium from the violation of his civil rights, from humiliating mistreatment and
       discrimination, and from feeling like his religious beliefs are not accepted by society.

101.   Hearst's conduct was so willful and wanton and in such reckless disregard of the

statutory rights of Mr. Rodrique so as to entitle him to an award of punitive damages

against Defendant, to deter it, and others, from such conduct in the future.

WHEREFORE, Mr. Rodrique requests that this Court enter a judgment in favor of Mr. Rodrique

and against Defendant Hearst, and award Mr. Rodrique backpay damages, with interest,

reasonable attorney's fees and costs, and any other relief that the Court deems proper, including

but not limited to, punitive damages for malicious deprivation of Mr. Rodrique's rights.

**COUNT II**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, AS**
**AMENDED ("ADA") 42 USC §§ 12111, et seq: DISCRIMINATION AND RETALIATION**
**ON THE BASIS OF PERCEIVED DISABILITY**

102.   Each of the preceding paragraphs 1 through 102 are hereby incorporated by reference.

103.   Mr. Rodrique is a "qualified individual" who was an employee of Hearst, as defined

under the ADA, 42 U.S.C. §§ 12111(4), 12111(8). Mr. Rodrique performed the essential

functions of his position admirably for sixteen years. During the COVID-19 pandemic,

and for nearly two years, Mr. Rodrique performed the essential functions of his position

using recommended measures for protection from COVID-19 infection, including

performing all of his duties remotely and most duties outdoors, wearing face masks, and

undergoing regular COVID-19 tests.

104.   The ADA prohibits employers from discriminating against "a qualified individual on the

basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a).

105.  Discrimination under the ADA includes "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C.S. § 12112(b)(1).

106.  Under the terms of the ADA, one is considered to have a disability if he or she: has "(A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment." 42 U.S.C § 12102(1).

107.  To establish a disability under the third definition, being regarded as having an impairment, the ADA provides: "(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 USC § 12102(3).

108.  Major life activities include basic tasks such as working, seeing, hearing, speaking, and breathing. 42 U.S.C. § 12102(2)(A). They also include "the operation of a major bodily function," including immune system functions, digestion, and normal cell growth. 42 U.S.C. § 12102(2)(B).

109.  Hearst and its employees believed that the immune systems of individuals who have not been immunized against the SARS-CoV-2 virus by vaccination are much less likely to prevent transmission of COVID-19. Because of this belief, "the bulk of [Hearst's] vaccinated employees [were] concerned about potential exposure to unvaccinated individuals."

110.   Hearst discriminated against Mr. Rodrique by treating/designating Mr. Rodrique as

unvaccinated for the purposes of its protocols, and then discharging him based on his

unvaccinated status, which Hearst perceived to be a physical impairment that

substantially limited the operation of Mr. Rodrique's immune system functions.

111.   In addition to discrimination itself, the ADA, 42 U.S.C. § 12203, prohibits retaliation for

certain protected activities:

> (a) Retaliation. No person shall discriminate against any individual because such
> individual has opposed any act or practice made unlawful by this chapter or
> because such individual made a charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing under this chapter.

> (b) Interference, coercion, or intimidation. It shall be unlawful to coerce,
> intimidate, threaten, or interfere with any individual in the exercise or enjoyment
> of, or on account of his or her having exercised or enjoyed, or on account of his or
> her having aided or encouraged any other individual in the exercise or enjoyment
> of, any right granted or protected by this chapter.

112.   By contesting Mr. Rodrique's eligibility for employment benefits because Mr. Rodrique

refused to "give up all rights to any money or other individual relief based on any agency

or judicial decision" regarding his separation, Hearst retaliated against Mr. Rodrique on

account of his having elected to exercise his rights to such relief under the ADA.

113.   Hearst's unlawful discrimination and retaliation is the direct and proximate cause of

deprivation of Mr. Rodrique's equal employment opportunities and his economic and

non-economic damages. Hearst's discharge of and retaliation against Mr. Rodrique in

violation of 42 U.S.C. § 12111 et seq. subjected Mr. Rodrique to economic loss,

including, but not limited to lost wages, thirteen weeks of contractually-promised

separation pay, $ 27,510 in unemployment insurance benefits, the loss of future earning

capacity, future loss of aggregate income, and job search expenses—as well as emotional

distress, pain, suffering, and loss of consortium from the violation of his civil rights, from

humiliating mistreatment and discrimination, and from being singled out among other employees for a perceived disability.

114.    Hearst's conduct was so willful and wanton and in such reckless disregard of the statutory rights of Mr. Rodrique so as to entitle him to an award of punitive damages against Defendant, to deter it, and others, from such conduct in the future.

WHEREFORE, Mr. Rodrique requests that this Court enter a judgment in favor of Mr. Rodrique and against Defendant Hearst, and award Mr. Rodrique backpay damages, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Rodrique's rights.

**COUNT III**
**VIOLATION OF RIGHTS TO FAIR HEARING UNDER FEDERAL UNEMPLOYMENT TAX ACT, 42 U.S.C. §§ 503(a)(3), AND FOURTEENTH AMENDMENT**

115.    Each of the preceding paragraphs 1 through 115 are hereby incorporated by reference.

116.    The Federal Unemployment Tax Act (FUTA), 42 U.S.C. §§ 503(a)(3), requires that states provide an "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied."

117.    In addition, the due process clause of the Fourteenth Amendment requires states to provide such a hearing at a meaningful time and in a meaningful manner.

118.    For nearly a year, DUA has failed to provide Mr. Rodrique the opportunity for a fair hearing under G.L. c. 151A, § 40 to contest the denial of his unemployment benefits.

119.    Any hearing that DUA would have provided would not have been before an impartial adjudicator because DUA has instructed its adjudicators to ignore equal employment opportunity laws and to not second-guess employers' decisions to deny religious

accommodations to employees like Mr. Rodrique any religious accommodation' COVID-19 vaccine policies. See Exhibit D.

WHEREFORE, Mr. Rodrique requests that this Court enter a judgment in favor of Mr. Rodrique and against Defendant Hearst, and award Mr. Rodrique money damages equal to his maximum unemployment benefit amount of $ 27,510, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Rodrique's rights.

**COUNT IV**
**VIOLATION OF M.G.L. c. 151B, § 4: DSICRIMINATION BASED ON RELIGION AND HANDICAP**

120.    Each of the preceding paragraphs 1 through 120 are hereby incorporated by reference.

121.    G.L. c. 151B, § 4(1) makes it an unlawful practice for an employer to discharge from employment or to discriminate against an individual in compensation or in terms, conditions or privileges of employment because of that individual's religious creed, unless based upon a bona fide occupational qualification.

122.    A three-part inquiry applies where an employee claims discrimination based on religion. The employee must 1) establish a prima facie case that the employer required the employee to violate a required religious practice, and 2) demonstrate that he gave the employer the required notice of the religious obligations. 3) If the employee makes this prima facie case, the burden then shifts to the employer to prove undue hardship.

123.    In determining whether an employer has met its burden of proving undue hardship, the focus is on the particular nature and operations of its business, so as to determine whether the discrimination is based on a bona fide occupational qualification. An employer's mere

30

contention that it could not reasonably accommodate an employee is insufficient to prove undue hardship.

124. As soon as Hearst announced its vaccination policy, Mr. Rodrique gave Hearst the required notice that the policy conflicts with his religious beliefs. Hearst then admitted that Mr. Rodrique "identified a sincerely held religious belief that conflicts with the [Hearst] vaccination policy." Nevertheless, it refused to engage in the interactive process of accommodating Mr. Rodrique's religious beliefs, despite various reasonable accommodations being available for an employee in Mr. Rodrique's videographer position.

125. Hearst's claims that it would experience undue hardship in accommodating Mr. Rodrique's religious practice were based on stated concerns about higher office transmission by unvaccinated persons that were inapplicable to Mr. Rodrique's remote field work, and that had been unfounded in the first place.

126. Being vaccinated for any number of diseases, thereby enjoying an immune system function that is alleged to be superior to that of the unvaccinated, may very well be a bona fide occupational qualification for health care workers, who must avoid being infected with various diseases by sick patients and transmitting them to other patients and colleagues.

127. Mr. Rodrique's occupation, on the other hand, did not require any contact with colleagues or human interview subjects, and when it did, his camera's focal length provided the social distance, while Mr. Rodrique wore face masks and received regular tests.

128.  G.L. c. 151B, § 4(3) makes it an unlawful practice for an employer "to discriminate in any way on the ground of . . . the handicap of a qualified handicapped person, unless based upon a bona fide occupational qualification."

129.  Coworker preference for not working with handicapped colleagues or stereotypical views regarding the handicap may never be a bona fide occupational qualification. See 804 CMR 3.01.

130.  The term "handicap" is defined in essentially the same way as the term "disability" is defined under the ADA. See G.L. c. 151B, § 1(17).

131.  Mr. Rodrique is a "qualified handicapped person," who was an employee of Hearst, as defined under G.L. c. 151B, § 16). Mr. Rodrique performed the essential functions of his position admirably for sixteen years. During the COVID-19 pandemic, Mr. Rodrique performed the essential functions of his position using recommended measures for protection from COVID-19 infection, including performing all of his duties remotely and most duties outdoors, wearing face masks, and undergoing regular COVID-19 tests.

132.  Hearst discriminated against Mr. Rodrique in violation of G.L. c. 151B, § 4(3) by treating/designating Mr. Rodrique as unvaccinated for the purposes of its protocols, and by then discharging him based on his unvaccinated status, which Hearst stereotypically regarded as an impairment that substantially limits his life activities by making him much more likely to transmit COVID-19 to others.

133.  Hearst admitted its claim that vaccination is a bona fide occupational qualification was based on coworker preference for not working with the unvaccinated, arguing that "the bulk of [Hearst's] vaccinated employees [were] concerned about potential exposure to unvaccinated individuals."

134.   Hearst's unlawful discrimination is the direct and proximate cause of deprivation of Mr.

Rodrique's equal employment opportunities and his economic and non-economic

damages. Hearst's discharge of Mr. Rodrique in violation of G.L. c. 151B, § 4 subjected

Mr. Rodrique to economic loss, including, but not limited to lost wages, thirteen weeks of

contractually-promised separation pay, $ 27,510 in unemployment insurance benefits, the

loss of future earning capacity, future loss of aggregate income, and job search

expenses—as well as emotional distress, pain, suffering, and loss of consortium from the

violation of his civil rights, from humiliating mistreatment and discrimination, from

being singled out among other employees for a perceived disability, and from feeling like

his religious beliefs are not accepted by society.

135.   Hearst's conduct was so willful and wanton and in such reckless disregard of the

statutory rights of Mr. Rodrique so as to entitle him to an award of punitive damages

against Defendant, to deter it, and others, from such conduct in the future.

 WHEREFORE, Mr. Rodrique requests that this Court enter a judgment in favor of Mr. Rodrique

and against Defendant Hearst, and award Mr. Rodrique actual damages, with interest, reasonable

attorney's fees and costs, and any other relief that the Court deems proper, including but not

limited to, punitive damages for malicious deprivation of Mr. Rodrique's rights.

**COUNT V**
**VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 12, §§ 11H-11I:**
**COERCIVE INTERFERENCE WITH FIRST AMENDMENT RIGHT TO SPEECH**

136.   Each of the preceding paragraphs 1 through 136 are hereby incorporated by reference.

137.   The MCRA, G.L. c. 12, § 11I, provides a right of action to "any person whose exercise or

enjoyment of rights secured by the constitution or laws of the United States, or of rights

secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with . . . by threats, intimidation or coercion."

138.  Non-renewal, cancellation, or other denial of an employment relationship is considered to be sufficiently threatening, intimidating, and coercive to violate G.L. c. 12, § 11I if it is done in order to interfere with a statutory or constitutional right. Specifically, am employer can violate G.L. c. 12, § 11I by suspending an employee without pay or depriving the employee of benefits in order to suppress the employee's free speech rights to criticize employer policies or express disfavored political opinions.

139.  By suspending Mr. Rodrique without pay for ten days, by requiring him to quit social media, including any accounts he had under pseudonyms, and by compelling him to undergo "sensitivity training" for fear of further adverse employment action, Hearst interfered with Mr. Rodrique's First Amendment speech right to express disfavored political opinions about the emergence of COVID-19, and to make "vulgar and reckless remarks about the media on Twitter," in violation of G.L. c. 12, § 11I.

140.  By conditioning its cooperation with Mr. Rodrique's application for unemployment benefits on 1) Mr. Rodrique "giv[ing] up all rights to any money or other individual relief based on any agency or judicial decision," and 2) Mr. Rodrique giving up his right to speak about the circumstances of his discharge; Hearst interfered with Mr. Rodrique's rights to such relief, and with his First Amendment rights in violation of G.L. c. 12, § 11I.

141.  Hearst's coercive interference with Mr. Rodrique's statutory and constitutional rights in violation of G.L. c. 12, § 11I is the direct and proximate cause of deprivation of Mr. Rodrique's equal employment opportunities and his economic and non-economic damages. Hearst's violation of G.L. c. 12, § 11I subjected Mr. Rodrique to economic

loss, including, but not limited to lost wages, thirteen weeks of contractually-promised separation pay, $ 27,510 in unemployment insurance benefits, the loss of future earning capacity, future loss of aggregate income, and job search expenses—as well as emotional distress, pain, suffering, and loss of consortium from the interference with of his civil rights.

WHEREFORE, Mr. Rodrique requests that this Court enter a judgment in favor of Mr. Rodrique and against Defendant Hearst, and award Mr. Rodrique compensatory damages, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Plaintiff,
By his attorney,

Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

DATED: December 19, 2022.

# Exhibit A

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

## - DISMISSAL -

| To: | Ilya I. Feoktistov, Esq. | Case: George Rodrique, II v. Hearst Stations, Inc., WCVB |
| --- | --- | --- |
| | Law Office of Ilya Feoktistov | TV, CT Corporation System - Registered agent |
| | 292 Newbury Street, #544 | MCAD Docket Number: 22NEM01401 |
| | Boston, MA 02115 | EEOC/HUD Number: 16C-2022-01604 |
| | | Investigator: BosIntern 24 |

Your complaint has been dismissed as follows:

[ ]   Pursuant to 804 CMR 1.08(1)(a) (2020), the Commission accords substantial weight to
the findings or resolution of the complaint by another forum and has decided to close the
investigation accordingly.

[X]   Pursuant to 804 CMR 1.08(1)(b) (2020), the complaint is dismissed after being
withdrawn pursuant to 804 CMR 1.04(12) (2020). You are required to file a copy of a
complaint filed in court after withdrawal from the Commission with the Commission's
Office of the General Counsel pursuant to 804 CMR 1.04(13) (2020).

[ ]   Pursuant to 804 CMR 1.08(1)(d) (2020), the complaint is administratively dismissed due
to:

      [ ] bankruptcy of a party
      [ ] death of a party
      [ ] inability to locate a party after providing the party 30 days in which to
         respond to a notice sent to the party's last known address
      [ ] adjudication by another forum
      [ ] unreasonable refusal by complainant to cooperate with processing the case
      [ ] failure to participate
      [ ] refusal to accept a reasonable settlement offer
      [ ] other:

[ ]   Pursuant to 804 CMR 1.08(1)(e) (2020), the parties have settled the case.

[ ]   Pursuant to 804 CMR 1.08(4)(a)(5) (2020), the Commission has entered an order
reversing a probable cause determination.

**Please note that further administrative or judicial review of the dismissal of your
complaint is unavailable.**

_Monserrate Quiñones_ ur     _June 29, 2022_
Monserrate Quiñones           Date
Investigating Commissioner

MCAD Docket Number 22NEM01401, Dismissal without Right to Appeal

# Exhibit B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

# DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 09/20/2022

**To:** George Rodrique, II
105 Larkspur Road
Stamford, CT 06903

Charge No: 16C-2022-01604

EEOC Representative and email:     Amon Kinsey
Supervisory Investigator
amon.kinsey@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
09/20/2022

Timothy Riera
Acting District Director

**Cc:**

Ilya I Feoktistov, Esq.
Law Office of Ilya Feokti
292 Newbury Street, #544
Boston, MA 02115

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 16C-2022-01604 to the District Director at Timothy Riera, 33 Whitehall St 5th Floor

New York, NY 10004.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# Exhibit C

 COVID-19 Vaccination Exemption Request Determination

*Sent via email: grodrique@hearst.com*

November 5, 2021

Dear Mr. George Rodrique,

We have carefully considered your request for a religious exemption from our COVID-19 vaccination requirement. We received your religious exemption accommodation request form on September 25, 2021. We met with you on October 26, 2021 to engage in the interactive process and discuss possible accommodations. We also followed up via email on October 28, 2021 to confirm the information discussed during the conversation. You did not respond to this email summary. For the sake of processing your request, we have assumed that you have identified a sincerely held religious belief that conflicts with the vaccination policy. However, after analyzing your request and the position you hold, we have determined that accommodating your request would pose an undue hardship, and therefore, we must deny the request.

The safety of our workplace and employees is our highest priority. We have determined that the most effective way to protect both from COVID-19 is to have staff in our offices be fully vaccinated. We have conducted an individualized assessment of your situation and have determined that allowing you to be in our offices unvaccinated on an indefinite basis creates significant risk of substantial harm to the health or safety of our workplace and employees. Furthermore, we do not feel that additional measures for you to enter our offices unvaccinated are sufficient to mitigate these risks. Considering these safety risks, we cannot provide you the religious exemption you requested.

In addition, permitting unvaccinated employees to enter our offices would require the Company to conduct costly weekly COVID-19 testing to maintain workplace safety. Further, unvaccinated employees are much more likely to have to quarantine if exposed to COVID-19 than vaccinated employees. These quarantines are highly disruptive to our operations and inhibit our ability to conduct business. For these additional reasons, granting you an accommodation from our vaccine requirement would pose more than significant cost, difficulty, and/or burden on the Company.

We also analyzed the essential functions of your job and have determined that an indefinite work-from-home option is not a reasonable accommodation for a variety of reasons, including but not limited to, the nature of your duties and the nature of our business. Finally, given the uncertainty surrounding the pandemic and when it will subside, we have also determined that it is unreasonable to temporarily place you on unpaid leave.

There are no other reasonable accommodations that would permit you to perform the duties of your role and/or not result in undue hardship to the Company.

Because we cannot accommodate your religious exemption request, you are still required to be fully vaccinated as a condition of your continued employment. We will afford you until 11/18/21 to get your first vaccination (if you elect a 2-dose series vaccine) and you must be fully vaccinated by 1/1/22 to continue your employment. If you still do not plan on being vaccinated, your employment will cease as of 11/19/21 and HR will contact you to discuss.

/s/ Kristin Hansen
HTV VP Human Resources

Exhibit D



**DEPARTMENT OF UNEMPLOYMENT ASSISTANCE
UI POLICY & PERFORMANCE
INTEROFFICE MEMORANDUM**

| Date:  October 14, 2021 |
| --- |
| Rescission(s): None |
| Reference No.:  UIPP 2021.10 |

TO:           All DUA Managers and Staff

FROM:      Emmy Patronick, Director of Policy and Performance

SUBJECT:   Adjudication of Separation Issues related to Vaccination Requirement

1. **PURPOSE:**

To provide guidance to staff on adjudication of separation issues related to failure to meet an employer's vaccination requirement(s).

2. **ATTACHMENTS:**
   - None

3. **BACKGROUND:**

Currently, some workers are experiencing a requirement imposed by employers that they be vaccinated as a condition of employment. This raises new scenarios when adjudicating 25(e) issues.

If a claimant is discharged for failure to comply with a vaccination requirement; in accordance with 25(e)(2) a claimant is ineligible for benefits when they have been discharged for a knowing violation of a reasonable and uniformly enforce rule or policy, or for deliberate misconduct in willful disregard of the employing unit's interest.

If a claimant voluntarily separates from employment rather than complying with the employer's rule or policy regarding vaccination, in accordance with 25(e)(1) a claimant is ineligible for benefits unless facts establish that the separation was for good cause attributable to the employing unit or for urgent, compelling, and necessitous reasons.

### 4. ACTION:

### Discharge

When a claimant has been discharged for failure to obtain the required vaccination(s), the fact finding must follow the standard questioning and fact pattern of 25(e)(2).

- Was there a rule?
- Did the claimant know of the rule?
- Was there a violation of the rule?
- Was the claimant consciously aware of the act and the fact that the action was a violation of the employer's rule or policy?
- Was the rule reasonable?
- Was the rule Uniformly enforced?
- Was the rule reasonably applied?

**If all the above have been answered "yes", the claimant will be ineligible for benefits.**

Otherwise, additional fact finding is needed.

**The claimant will be ineligible for benefits unless the facts establish that the claimant's refusal of vaccination was due to a substantiated medical condition that prevented vaccination or a sincerely held religious belief, and no opportunity to request or apply for reasonable accommodation was offered by the employer.**

If an employer's vaccine policy permitted such requests and a claimant's request for an exemption or accommodation was denied, Adjudicators should not "second guess" the employer's decision. Specifically, Adjudicators should not ask to review medical documentation that was already reviewed by the employer and found to be insufficient to support a medical exemption. Similarly, where an employer—through a review of documentation or an interview, or some other reasonable process—has found that an employee's professed religious belief either is not sincerely held or does not prevent the employee from being vaccinated, an Adjudicator should not attempt to overturn that decision through paper fact finding. Nor should Adjudicators permit employees to submit documentation or raise arguments that were not made at the time of the discharge.

Importantly, DUA is not the MCAD or the EEOC. Our Adjudicators are not sufficiently trained or authorized to make determinations regarding an employer's compliance with the reasonable accommodation provisions of the ADA, Title VII of the Civil Rights Act of 1964, MGL c. 151B, or any other EEO considerations or legal requirements.

**Voluntary Quit**

When a claimant voluntarily separates from employer rather than complying with the employer's rule or policy regarding vaccination, the fact finding must follow the standard voluntary quit questioning and fact pattern of 25(e)(1).

- Did the claimant voluntarily leave the job?
- Did the claimant have a reasonable belief that they had no choice but to leave?
- Were there urgent, compelling, and necessitous reasons for the separation?
- Did the claimant establish the separation was for good cause attributable to the employer?

**When a claimant voluntarily separates from employment rather than receiving a vaccination, the separation must be viewed as a disagreement with the employer's policies or methods of operation.  Unless the claimant can establish that the policy in question violates a statute, regulation or public policy, the claimant will be disqualified under 25(e)(1).**

5.  **QUESTIONS**: Please email UIPolicyandPerformance@detma.org